IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

HIWASSEE COLLEGE, INC.,         :
                                :
          Plaintiff,             :
                                :
      v.                     :       CIVIL ACTION NO.
                                :       1:05-CV-0951-JOF
THE SOUTHERN ASSOCIATION OF   :
COLLEGES AND SCHOOLS, INC.,     :
                                :
          Defendant.           :

**OPINION AND ORDER**

This matter is before the court on Defendant's motion for summary judgment [84-1]; Plaintiff's motion for partial summary judgment on Count IV of Plaintiff's Second Amended Complaint [94-1]; Plaintiff's supplemental motion for summary judgment on Counts I and IV of the Second Amended Complaint [112-1]; Plaintiff's motion to strike Exhibit 1 of Defendant's reply brief [129-1]; and Defendant's motion to strike affidavit [132-1].

I.       **Background**

      A.       **Procedural History**

Plaintiff, Hiwassee College, filed suit against Defendant, The Southern Association of Colleges and Schools ("SACS"), on March 10, 2005, in the United States District Court for the Eastern District of Tennessee. Plaintiff alleges that SACS violated its constitutional due

process rights, the Higher Education Act, and common law due process when it withdrew its accreditation of the college on February 24, 2005.   During proceedings in the Eastern District of Tennessee, the district court entered a temporary restraining order requiring SACS to restore Hiwassee's accreditation pending the outcome of these proceedings.   The case was then transferred here.

On April 19, 2006, the court held a discovery hearing concerning Plaintiff's motion to compel.   At that time, the court directed the manner in which the parties were to complete discovery and submit briefing on their motions for summary judgment.[1]   Plaintiff filed a motion for partial summary judgment in Counts I and IV of its complaint, which respectively address SACS' failure to follow its own rules and SACS' status as a "federal actor."   SACS filed a cross-motion for summary judgment on all of Plaintiff's claims.

**B.     Facts**

SACS is a non-profit membership corporation incorporated under the laws of Georgia. Its membership is composed of public and non-public schools in eleven southern states. SACS operates through three "commissions," including the Commission on Colleges, which is recognized by the United States Department of Education as the regional body for

---

[1]Plaintiff's supplemental motion for summary judgment on Counts I and IV of the Second Amended Complaint [112-1] supercedes Plaintiff's motion for partial summary judgment on Count IV of Plaintiff's Second Amended Complaint [94-1].   Therefore, the court DENIES AS MOOT Plaintiff's motion for partial summary judgment on Count IV of Plaintiff's Second Amended Complaint [94-1].

AO 72A
(Rev.8/82)

accreditation of higher education institutions in Alabama, Florida, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, South Carolina, Tennessee, Texas, and Virginia. Hiwassee College is a private, two-year college in Madisonville, Tennessee, affiliated with the United Methodist Church.  Dr. James Noseworthy is the President of Hiwassee.  Hiwassee College became a member of SACS in 1958, and its accreditation was most recently affirmed in December 2000.   At that time, the Reaffirmation Committee did note that Hiwassee had many "financial challenges," including physical maintenance of the school, projected revenue shortfalls, and problems with interfund borrowing.   Because of these concerns, SACS required Hiwassee to submit a Follow-Up Report which would address Hiwassee's compliance with five of SACS' *Criteria for Accreditation* focusing on financial resources.   After receiving the Follow-Up Report, SACS placed Hiwassee on warning for twelve months due to its failure to comply with three of the *Criteria for Accreditation* dealing with Hiwassee's financial resources.   SACS then requested a Second Follow-Up Report.   In December 2002, after receiving the Second Follow-Up Report, SACS placed Hiwassee on a twelve-month period of probation due to lack of compliance with the same three *Principles of Accreditation*.   SACS requested a Third Follow-Up Report and authorized a Special Committee to make an on-site visit to Hiwassee.   The Third Report was submitted in December 2003, and the Commission on Colleges notified Hiwassee that it would be continued on probation and another Special Committee would be authorized to address Hiwassee's failure to comply with Section 2.11 of the *Principles of Accreditation* relating to financial resources.    (As will be discussed

AO 72A
(Rev.8/82)

further below, during this time SACS was transitioning from the *Criteria for Accreditation* to the *Principles of Accreditation*.)

On January 16, 2004, SACS notified Hiwassee that its compliance with Core Requirement 2.11 would "function as a Comprehensive Standard."   *See* Letter from Dr. Rogers to Dr. Noseworthy, dated Jan. 16, 2004.   Core Requirements "are basic qualifications that an institution must meet to be accredited with the Commission on Colleges."   *See Principles of Accreditation*, § 2, at 13.   Core Requirement 2.11 states the "institution has a sound financial base, demonstrated financial ability, and adequate physical resources to support the mission of the institution and the scope of its programs and services."   *Id.*, § 2.11, at 17.   Comprehensive Standards "set forth requirements in the following three areas: institutional mission, governance, and effectiveness; programs; and resources.   The Comprehensive Standards represent good practices in higher education and establish a level of accomplishment expected of all member institutions."   *Id.* at 8.

SACS also informed Hiwassee that it would require a Fourth Follow-Up Report prior to the on-site visit of another Special Committee.   The January 16, 2004 letter also informed Hiwassee that:   "With its upcoming review in December 2004, your institution will have exhausted its probationary status and its period of continued accreditation for good cause.   At that time, the institution must be determined to be in compliance with all of the *Principles of Accreditation* or be removed from membership."   *Id.*

4

The Special Committee was made up of Dr. Michael S. Johnson, Associate Vice President for Academic Affairs at Spring Hill College in Mobile, Alabama; Dr. Charlie D. Fiskeaux, Vice President for Business Affairs and Treasurer, Asbury College in Wilmore Kentucky; and Ms. Laurette L. LePrevost, Dean of Arts and Sciences, Caldwell Community College and Technical Institute, Hudson, North Carolina.   Hiwassee submitted its Fourth Follow-Up Report on September 17, 2004, and the Special Committee visited the college on October 11 and 12, 2004.

The Special Committee submitted its report to Hiwassee on November 9, 2004.   The Special Committee outlined thirteen findings relating to the financial condition of the college. Those findings include:   (1) enrollment trends are modest at best and unless first-year enrollment could increase by 130.8%, the net tuition revenues would not meet levels forecasted by the college, (2) tuition discounts are increasing slightly, (3) private gifts and grants have decreased in the past three years, (4) governmental grants have increased but not sufficiently to offset the private decline, (5) significant interfund borrowing of $4.66 million with a plan inadequate to repay the borrowings, (6) current ratio of 17% indicates insufficient cash flow to adequately cover operations, (7) notes payable have increased, (8) funds borrowed from lines of credit have been used to support operations, without debt service for repayment being budgeted, (9) operations "used" cash in each of the past five years that was acquired through investing and financing, (10) 43% of the endowment assets have been loaned to other funds groups and unsustainable amount has been released to operations, (11) real

5

estate has become increasingly larger part of permanently restricted assets, limiting liquidity and potential earning, (12) increases in unrestricted net assets in four of the past five years, while total assets decreased in four of the past five years, indicating shifting of assets from restricted to unrestricted and increasing leverage, and (13) current and projected budgets require large draws on endowment and aggressive enrollment increases making budget assumptions appear less than reasonable. *See* Special Committee Report, at 18-19. The Special Committee concluded that "it is absolutely clear that continuation of the financial path of recent years is not sustainable" and that "recent financial trends leave the institution out of compliance with Core Requirement 2.11 (Resources) of the *Principles*." *Id.* at 18.

SACS informed Hiwassee that the report of the Special Committee would be considered at SACS' December 2004 meeting, and Hiwassee was directed to provide a response to the report by November 15, 2004. On December 4, 2004, Hiwassee appeared before SACS' Committee on Compliance and Reports. On December 13, 2004, SACS notified Hiwassee that it had voted to remove the College's accreditation for failure to comply with Section 2.11 of the *Principles of Accreditation*.

Hiwassee notified SACS that it intended to appeal the decision. The *Policies of the Commission on Colleges* indicate that grounds for appeal are only: (1) "that the Commission failed to follow its procedures and that this failure was significant in leading to the decision," and (2) "that the Commission's decision was arbitrary, that is, was unreasonable and not based

on, or consistent with, the published *Principles of Accreditation* or policies of the Commission." *See Policies of the Commission on Colleges*, at 3.

"At least 30 days before the date of the appeals hearing, the Commission must submit to the institution and the appeals Hearing Officer documents (administrative record) used by the Commission leading to and arriving at the decision regarding the institution." *Id.* at 4.

> The Commission bases its adverse decision on committee reports, institutional responses and any other documentation and evidence presented by the institution. . . . *In addition, neither the Commission nor the institution may include new materials as part of their briefs presented to the Appeals Committee nor may they introduce new evidence during the appeals hearing.*

*Id.* at 4 (emphasis in original).

On February 24, 2005, Edward D. Jackson, Chair of the Appeals Committee of the Commission on Colleges, wrote to Dr. Noseworthy and informed him that the Commission on Colleges' decision had been affirmed.   Hiwassee then filed suit in the United States District Court for the Eastern District of Tennessee.   That court entered a temporary restraining order against SACS barring it from removing Hiwassee's accreditation and ordered the case transferred to this court pursuant to a forum selection clause.   This court ruled that the temporary restraining order was to remain in effect.

### C.    Contentions

Hiwassee contends that due to the entanglement between the Department of Education and SACS in its role as an accrediting agency under the Higher Education Act, SACS is a state

7

actor for the purposes of section 1983.   Hiwassee argues that SACS has violated its Fifth Amendment constitutional right to due process because SACS did not follow its own rules during the accreditation process and because SACS' decision to remove Hiwassee from membership was arbitrary and capricious.   Hiwassee also asserts that SACS' actions violate common law due process applicable in the accreditation context.   Finally, Hiwassee avers that the Higher Education Act contains an implied right of action for Hiwassee against SACS.

SACS responds by arguing that under relevant Supreme Court authority, SACS cannot be considered a state actor under section 1983.   SACS argues that the Georgia state law of associations should apply to SACS' actions and not "common law due process."   Even if the court applies common law due process, SACS denies that it did not follow its own rules and procedures and contends that the decision to remove Hiwassee from membership was not arbitrary.   Finally, SACS contends that the courts that have considered the issue have held that the Higher Education Act does not contain an implied right of action for institutions.

## II.   Discussion

### A.   Standard of Review

Both parties expend a great deal of energy in determining whether SACS is a "state actor" for the purposes of 42 U.S.C. § 1983.   The court finds it need not reach this issue, however, because each of the due process complaints raised by Plaintiff is also governed by the notion of "common law due process" which courts have applied in the accreditation context.   *See*, *e.g.*, *Auburn v. The Southern Association of Colleges & Schools, Inc.*, 2002

U.S. Dist. LEXIS 26478 (N.D. Ga. 2002) (Forrester, J.).  Plaintiff has not alleged any theories under which its complaints would only fit under "constitutional" due process and not "common law" due process.  Thus, the court can consider the totality of Plaintiff's complaint without having to reach the thorny constitutional issue of whether SACS is a "state actor" for the purposes of section 1983.  *See*, *e.g.*, *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) (it is a "fundamental and longstanding principle of judicial restraint [that] courts avoid reaching constitutional questions in advance of the necessity of deciding them").[2]

It will be helpful, therefore, to review the contours of "common law" due process.[3]  In *Auburn*, this court noted that the "essential elements of due process are notice and an

---

[2]Hiwassee filed a motion to strike Exhibit 1 from SACS' reply brief.  Exhibit 1 purports to demonstrate that SACS did not alter more than eleven of its accreditation criteria in response to Department of Education requirements.  Because the court declines to make any holding with respect to whether SACS is a state actor, the court DENIES AS MOOT Hiwassee's motion to strike Exhibit 1 from SACS' reply brief [129-1].

[3]SACS asks the court to revisit the issue of whether "common law due process" should apply in accreditation cases.  Nothing in SACS' briefing in this case convinces the court that its ruling in *Auburn* was incorrect.  In fact, since then, other courts, including the Sixth Circuit in *Cooley*, have applied the notion of common law due process in the accreditation context.  The court, therefore, declines SACS' invitation to apply the "state law of private associations" to this case.  The court further notes that SACS makes a half-hearted attempt to assert that the law of Georgia applies under the "law of the case" doctrine because the district court in Tennessee ruled that the agreements created by the Commission must be "interpreted in accordance with the laws of the State of Georgia."  *See* Order dated April 8, 2005.  This ruling, however, dealt with whether SACS' forum selection clause applied and did not address the issue of common law due process.

9

opportunity to respond." *Id.* at *31.   Further, "an open, fair and deliberative process seems essential to protect all interests and to assure some measure of confidence in the outcome of the inquiry." *Id.* at *32.   Finally, the court noted that failure of SACS to follow its own rules would deny the institution due process, as would any conflict of interest.  *Id.* at *35-36.

Other courts analyze "common law" due process claims in accreditation cases with reference to administrative law.  *See Thomas M. Cooley Law School v. ABA*, 459 F.3d 705, 712 (6th Cir. 2006)  (the "court reviews only whether the decision of an accrediting agency such as the ABA is arbitrary and unreasonable or an abuse of discretion and whether the decision is based on substantial evidence").  The *Cooley* court went on to elaborate:

> [W]hile principles of federal administrative law provide guidance in our analysis, judicial review of accreditation decisions is more limited than review under the [Administrative Procedures] Act.   Although accrediting agencies perform a quasi-governmental function, they are still private organizations. Courts have made the policy decision to ensure that these organizations act in the public interest and do not abuse their power, but judicial review is limited to protecting the public interest.   Recognizing that the standards of accreditation are not guides for the layman but for professionals in the field of education, great deference should be afforded the substantive rules of these bodies and courts should focus on whether an accrediting agency such as the ABA followed a fair procedure in reaching its conclusions.  We are not free to conduct a *de novo* review or substitute our judgment for that of the ABA or its Council.   Rather, in analyzing whether the ABA abused its discretion or reached a decision that was arbitrary or unreasonable, we focus on whether the agency conformed its actions to fundamental principles of fairness.

*Id.* at 713 (citations and quotations omitted).   "An abuse of discretion can only be found if no evidence supports the decision or if the agency misapplied the law." *Id.*

10

Regardless of the label placed on "common law due process," the court does not underestimate its importance.   The court quite clearly recognizes that SACS' decision to remove Hiwassee from its membership places the College in a critical position and most likely would signal its demise in that at the very least federal financial aid is unavailable to unaccredited schools.[4]

**B.     Due Process Allegations**

The court notes that Hiwassee varies between criticizing SACS' decision to remove accreditation on the whole with addressing several individual components of SACS' decision. It is important for the court's analysis to parse these arguments.   It is significant to the court that Hiwassee has never front-on challenged the ultimate decision of SACS that Hiwassee failed to come into compliance with Section 2.11 of the *Principles of Accreditation*.   For example, Hiwassee never contends that it has satisfied the requirements of Section 2.11. Rather, Hiwassee attacks the decision peripherally by arguing that the Special Committee did not understand the pressures on a two-year residential college serving rural students, that the

---

[4]The court also notes that it has reviewed *Edward Waters College, Inc. v. SACS*, 2005 U.S. Dist. LEXIS 39443 (M.D. Fla. 2005) (Corrigan, J.), cited by Hiwassee to support its partial motion for summary judgment.   The court notes that the procedural posture of that case – on a motion for a preliminary injunction – obviously differs from the motions for summary judgment before the court here.   Further, the court finds that the factual circumstances of that case are so unique as to be distinguishable.   That is to say, this court and the *Edward Waters College* court both agree that some aspect of due process applies to SACS' accreditation decisions.   Beyond that, the fact-intensive nature of such an inquiry renders *Edward Waters College* of limited value here.

Committee placed too much emphasis on interfund borrowing, and that the Committee did not incorporate Hiwassee's re-characterization of a long term debt.[5]

Similarly, Hiwassee College deflects scrutiny of its financial situation when it argues that the "quality of its academic program was never at issue – a notable omission when the quality of the academic program is the most important purpose of accreditation." *See* Plaintiff's Response, at 1, 44-45. The relevance of this comment is unclear to the court. This is an argument that the entirety of the *Principles of Accreditation* is misguided because it includes discussion of a school's financial stability. Again, none of this has any due process relevance. The court's role is not to determine whether SACS has appropriately prioritized financial stability with quality of academic programs. As the court noted in *Auburn*, the institutions that belong to SACS are "voluntary members" and "consented to be judged" on accreditation matters when they joined the association. *See Auburn*, 2002 U.S. Dist. LEXIS 26478, at *45.

_____

[5]Hiwassee also argues that there are no definite requirements to demonstrate "financial stability" pursuant to Section 2.11 of the *Principles* and that each member of the Special Committee had a different view of what the standard means. For example, Dr. Fiskeaux testified that financial stability is measured by "peer review by professional assessment." *See* Fiskeaux Depo., at 87. Dr. Johnson testified that it is whether a "college is maintaining its viability." *See* Johnson Depo., at 87. Dr. Cormier testified that her idea of financial stability would be looking further out than five or ten years, and more toward twenty years of viability. *See* Cormier Depo., at 51. The court does not find that any of this testimony is inconsistent. Section 2.11 states that the "institution has a sound financial base, demonstrated financial stability, and adequate physical resources to support the mission of the institution and the scope of its programs and services." *See Principles*, at 17. The thirteen findings of the Special Committee specifically addressed financial matters relevant to this standard.

The Report of the Special Committee documents the financial difficulties of the school. Even considering all of the information brought to bear by Hiwassee, the court would be hard pressed to determine that SACS' bottom-line determination that Hiwassee was not in compliance with Section 2.11 was arbitrary or capricious, or an abuse of discretion. The court recognizes that Hiwassee disagrees with the emphasis SACS places on financial stability and argues that it was attempting to come into compliance and was being forced to put too many of its resources to responding to SACS' multiple requests for information and Follow-Up Reports. And it is possible that a different body reviewing the information might come to a different conclusion than the Special Committee, the Committee on Compliance and Reports, the appeals hearing board, the Executive Council, and ultimately the Commission on Colleges. But that is not the standard of review, whether it is labeled constitutional due process or common law due process. As the court in *Cooley* set forth, judicial review of the decisions of an accrediting agency are conducted under a deferential eye. The court, however, does carefully consider each part of the process raised by Hiwassee to determine whether any of the steps could constitute a violation of "common law due process."[6]

-------------------

[6]In its response to Defendant's motion for summary judgment, Plaintiff asserts that SACS arbitrarily misrepresented data to support its decision. *See* Response, at 45-48. However, a review of the instances cited by Hiwassee shows not that SACS misrepresented data but rather that Hiwassee disagrees with SACS' view of the data. For example, Hiwassee contends that its enrollment did drop in 2004 due to the initiation of the Tennessee Educational Lottery Scholarship. Hiwassee responded to this by developing its own grant to compete with the lottery scholarships. Therefore, Hiwassee believes that the 2004 drop was an aberration. Hiwassee disagrees that the drop in enrollment required it to move $950,000

1.   Peer Review

Hiwassee asserts that it was denied a peer review process as required in the *Principles of Accreditation*. Hiwassee contends that its Special Committee was not made up of peers because none of the institutions on the Special Committee were religiously-affiliated two-year residential degree programs serving rural localities. SACS responds that each member of the Commission is considered a "peer."

The parties have diverged in their attempts to locate a definition of "peer" within SACS' policies. Hiwassee initially contends that SACS has defined "peer" institution as "similar in governance and degrees offered." *See Principles of Accreditation*, at 10. This statement, however, is contained in Section 1 of the *Principles of Accreditation* entitled "Principles and

_____

from its endowment to balance the budget. *See id.* at 46-47. Hiwassee asserts, rather, that the $950,000 was "released" from the endowment because the donor removed its restrictions. All of this information, however, was before the SACS' decision-makers because Hiwassee cites to the Administrative Record in its discussion. *See id.* at 45-46. Hiwassee may disagree with the emphasis SACS chose to place on the drop in enrollment, but it is not a misrepresentation of data to say that Hiwassee's enrollment dropped in 2004. Hiwassee asserts that SACS "denigrated" its annual fund and capital campaign goals because it found there was not sufficient staffing for the development office. Hiwassee contests this finding because many "smaller institutions with modest means" fund the development office through money raised in a capital campaign. *See id.* at 47. Again, Hiwassee may disagree with the weight to place on the staffing of the development office, but SACS did not misrepresent the data.

Finally, Hiwassee asserts that SACS' emphasis on interfund borrowing was improper in this Special Committee visit because the school has had interfund borrowing problems since the 1990s. The court finds that there was no misrepresentation of this issue, and the weight SACS chooses to give to any particular aspect of resources in the application of Section 2.11 is a matter to which SACS is entitled to great deference.

14

Philosophy of Accreditation."   Under that section is a subsection entitled Components of the Peer Review Process.   This subsection describes that a review by the Commission takes the form of either Off-Site Peer Review or On-Site Peer Review.   In Off-Site Peer Review, a committee of eight evaluators meets at an off-site location and reviews the compliance of a group of institutions.   "The group of institutions, called a cluster, normally will consist of five institutions similar in governance and degrees offered."   *Id.*   In its reply to SACS' motion for summary judgment, Hiwassee appears to recognize that the Off-Site Peer Review process does not apply to Hiwassee's circumstances because the College now argues, instead, that SACS does not have a policy that defines "peers."

The court agrees that there is no definition of "peer" institution for these purposes in any of SACS' policies or documents.   Thus, the court must determined whether SACS' application of "peer" here was arbitrary or capricious or an abuse of discretion or in any other manner violates a notion of common law due process.   Hiwassee complains that the composition of the Special Committee did violate due process because all of the member institutions represented were bigger than Hiwassee, two of the institutions offered bachelor's and master's degrees, and only one of the members offered a two-year degree program, but that school was a state community college, and none of the schools was a two-year residential program.

Hiwassee also proffers the testimony of Thomas S. Yow, III, the President of the United Methodist Higher Education Foundation and former President of Young Harris

15

College, a two-year residential college. Dr. Yow testified that in "my professional opinion, two-year private residential colleges, particularly in the SACS eleven-state region, have a distinct educational mission because almost all of these institutions are located in rural communities. The students these institutions serve are usually first generation college students and come from lower income families." *See* Yow Aff., ¶ 9. "In my professional opinion, private residential two-year colleges are significantly different than private four-year colleges and universities offering associate, bachelor, and advanced graduate degrees." *Id.*, ¶ 12. He further testified that two-year residential colleges face unique challenges with enrollment and alumni loyalty and do not have significant endowments. *Id.*, ¶¶ 13, 15, and 16.[7]

The Special Committee convened for Hiwassee consisted of Dr. Michael Johnson, at the time the Associate Vice President for Academic Affairs at Spring Hill College, a faith-based institution in Mobile, Alabama; Dr. Charles Fiskeaux, the Vice President for Business

---

[7]SACS filed a motion to strike the affidavit of Dr. Yow because it contains expert testimony and Dr. Yow was not disclosed as an expert. Based on Dr. Yow's repeated use of the term "in my professional opinion," the court certainly understands why SACS has the belief that Dr. Yow is attempting to proffer expert testimony. Particularly, Dr. Yow's statements that in "my professional opinion, when the finances of a private two-year residential college are evaluated, the appropriate professional judgment of an evaluator must include the context and understanding of the unique nature of private two-year residential colleges" and "in my professional opinion, a fair peer review process for a private two-year residential college must include evaluators who have professional experience working in a private two-year residential college," *see id.*, ¶¶ 18-19, might support such a conclusion. In any event, because the court finds that even considering Dr. Yow's testimony, the makeup of the Special Committee does not violate Hiwassee's due process rights, the court need not reach the issue of whether Dr. Yow's testimony is expert or lay. The court DENIES AS MOOT Defendant's motion to strike Dr. Yow's affidavit [132-1].

16

Affairs and Treasurer of Asbury College, a faith-based institution in Wilmore, Kentucky; and Ms. Laurette LePrevost, the Dean of Arts and Sciences at Caldwell Community College and Technical Institute in Hudson, North Carolina.  The Special Committee included an institution that awarded two-year degrees and has a student population that includes rural, poor, and first generation college students.  Two of the schools were faith-based institutions which would have an understanding of Hiwassee's affiliation with the United Methodist Church as well as its commitment to serving rural communities.  The court has no doubt that, as Dr. Yow expresses, two-year residential colleges have different attributes and challenges than other institutions of higher education.  But that is not the question before the court.  Rather, the court must determine whether Hiwassee's due process rights were violated because none of the members of the three member Special Committee came from a two-year residential college.

Taken to its logical conclusion, Hiwassee's argument would reduce the notion of "peer" to a member institution with the exact same characteristics as Hiwassee.  This requirement would be neither practical nor meaningful.  Further, there is no basis in the record for concluding that unless the Special Committee included a representative from a two-year residential college, the Committee would not be able to provide a fair and balanced assessment of Hiwassee.  Finally, Hiwassee's assertion that "[h]ad the special committee consisted of 'peers' who understood the nature of private two-year institutions and respected the unique challenges they encounter, the outcome would have been different," *see* Motion,

17

at 11, is pure speculation.  The court finds that the composition of the three-member Special Committee does not constitute any kind of arbitrary or capricious undertaking by SACS and does not violate any common law due process.

2.     <u>Comprehensive Standard v. Core Requirement</u>

In 2004, SACS transitioned from accreditation standards based upon *The Criteria for Accreditation* to the new *Principles of Accreditation*.  Under the "old" standard of Section 6.3.1 of the *Criteria for Accreditation*, Hiwassee had to "demonstrate that the college had sufficient financial resources to support all of its programs."  Under the "new" standard of Section 2.11 of the *Principles of Accreditation*, Hiwassee was required to "provide evidence that the institution has a sound financial base and demonstrated financial stability to adequately support the mission of the institution and the scope of its programs and services."

Hiwassee asserts that SACS did not want to alter the playing field during the transitional year and thus agreed to evaluate Hiwassee's compliance with Section 2.11 as a "Comprehensive Standard and not as a Core Requirement."  *See* Benberg Depo., at 67; January 16, 2004 letter.  Hiwassee asserts that under the *Principles of Accreditation*, a violation of a "Comprehensive Standard" is not as severe as a violation of a "Core Requirement." However, Hiwassee asserts, the Special Committee as well as the Committee on Compliance and Reports and the Executive Council considered Section 2.11 as a Core Requirement and not a Comprehensive Standard.  Finally, the Commission on Colleges voted to remove Hiwassee from SACS' membership "for failure to comply with Core Requirement 2.11."

18

SACS responds that it is irrelevant whether Section 2.11 was applied as a Core Requirement or a Comprehensive Standard because on January 16, 2004, SACS informed Hiwassee that it needed to be "in compliance with all of the *Principles of Accreditation* or be removed from membership."

The court addressed above the factual chronology of SACS' supervision of Hiwassee College. Because of its importance in this context, the court excerpts more extended portions of the January 16, 2004 letter from SACS to Hiwassee. Dr. Rogers first reviewed the actions taken by the Commission on Colleges at its December 2003 meeting, including (1) reviewing Hiwassee's Third Follow-Up Report, (2) authorizing another Special Committee visit to Hiwassee, and (3) requesting a Fourth Follow-Up Report due September 22, 2004, specifically addressing Section 2.11 (Resources). The letter then went on to describe what Hiwassee should provide in that Report including financial audit reports. The letter stated: "(Note: During this transitional year, this particular follow up functions as a Comprehensive Standard and not as a Core Requirement.)." *See* January16, 2004 letter, at 1. Dr. Rogers continues:

> As you know, the *Principles of Accreditation* became effective January 1, 2004. The Commission's December 2003 actions were taken under the *Criteria for Accreditation*. The above action requiring a future report refers to the applicable section of the *Principles*.
> . . .
> With its upcoming review in December 2004, your institution will have exhausted its probationary statute and its period of continued accreditation for good cause. At that time, the institution must be determined to be in

> compliance with all the *Principles of Accreditation* or be removed from
> membership.

*Id.* at 1-2.   The court finds that this letter does set forth that the Fourth Follow-Up Report

would function as a Comprehensive Standard and not a Core Requirement, but it goes on to

state that by the end of the year – December 2004 – Hiwassee had to be in compliance with

all of the *Principles of Accreditation* because the school had run out of options for extension

of supervision.

Furthermore, even if the court accepts Hiwassee's assertion that it was to be reviewed

under the "Comprehensive Standard," Hiwassee has not shown that under the *Principles of*

*Accreditation*, a "Comprehensive Standard" violation is not as severe as a "Core Requirement"

violation.   The *Principles of Accreditation* discuss the process of accreditation at length,

including the Core Requirements and Comprehensive Standards.   *See Principles of*

*Accreditation*, at 6-9.   The *Principles* note that the Commission evaluates an institution and

makes accreditation decisions based on: (1) compliance with the *Principles*, (2) compliance

with the Core Requirements, (3) compliance with the Comprehensive Standards, and (4)

compliance with additional federal regulations.   *Id.* at 7.

The *Principles* go on to state:

> Compliance with the Core Requirements is essential for gaining and
> maintaining accreditation with the Commission on Colleges.   The requirements
> establish a level of development required of an institution seeking initial or
> continued accreditation.   Compliance with the Core Requirements is necessary
> but not sufficient to warrant accreditation or reaffirmation of accreditation.

20

*Id.* at 8.

> Comprehensive Standards set forth requirements in the following three areas: institutional mission, governance, and effectiveness; programs; and resources. The Comprehensive Standards represent good practices in higher education and establish a level of accomplishment expected of all member institutions. Institutions respond to each Comprehensive Standard either by confirming compliance or by explaining those situations that constitute non-compliance.

*Id.*

The court finds, therefore, that the policy establishes that accreditation decisions are based on compliance with ***both*** the Core Requirements and the Comprehensive Standards and there is nothing in SACS' policy which states that failure to comply with a Comprehensive Standard could not result in a sanction of removal from membership. Particularly in light of the history of Follow-Up Reports and Special Committee Visits honing in on Hiwassee's financial resources, there is nothing in the record to show that regardless of the label given to Section 2.11 (Resources) during Hiwassee's review, a failure to satisfy that section would not have resulted in a decision to remove Hiwassee from membership.

3.      Hiwassee's Current Financial Information

Hiwassee contends that the Special Committee refused to review critical information available at the time of its on-site visit. Hiwassee asserts that a $393,143 construction line of credit was listed as a "current debt" in the College's June 14, 2004 financial statement. However, by the time of the Special Committee's visit, the line of credit had been refinanced with a fifteen percent note which converted it to long-term debt. But the Special Committee

21

kept the debt as "current" when calculating its ratio to determine Hiwassee's financial stability.  Had the characterization been changed, Hiwassee asserts, its ratio would have been 143% rather than the 88% calculated by the Special Committee.  SACS responds that Dr. Fiskeaux did not apply the new characterization to the ratio calculation because the ratio would then have been based upon numbers from two different time periods.[8]

Dr. Fiskeaux testified that he believed it would be inappropriate in an accounting sense to construct a current financial ratio from data taken at two different points in time.  Hiwassee has not proffered any evidence to show that Dr. Fiskeaux's decision was arbitrary or an abuse of discretion with respect to accounting practices.  Therefore, the court cannot conclude that Dr. Fiskeaux's decision violated Hiwassee's due process rights.

4.     Financial Expertise of Special Committee

Hiwassee contends that the Special Committee had only one representative – Charlie Fiskeaux – who was versed in financial issues.  Hiwassee contends that this is contrary to SACS' policy which states that "[f]or a committee where the focus is on financial issues, there must be additional committee members accompanying the financial reviewers in order to assess the impact of financial instability on the institution."  *See Policies of the Commission*

---

[8]The court disagrees that Dr. Fiskeaux's approach contradicted the testimony of Dr. Rogers.  Dr. Rogers testified that the institution could provide to the Committee on Compliance and Reports substantiation for a change that has taken place at the institution since the Special Committee site visit.  He did not testify that it was appropriate to construct a "current ratio" from numbers taken from two different time periods.

*on Colleges*, Special Committee Procedures and Team Report, ¶ 2, at 1, Bates No. 67. Hiwassee asserts that Dr. Fiskeaux had drafted an initial report on the College's financial status a week before the site visit and forwarded it to the other committee members who did not have the expertise to challenge Dr. Fiskeaux's assessment.  Hiwassee contends that his initial draft report remained essentially unchanged in the final report.  As such, Dr. Fiskeaux exercised undue influence over the other two panel members and had one other member had a sufficient financial background, Hiwassee argues the outcome might have been different.

SACS responds that in addition to Dr. Fiskeaux, Special Committee Chair Dr. Michael S. Johnson also had an extensive background in financial matters.  Dr. Johnson has a bachelor's and doctoral degree in economics.  He has taught economics at four colleges and has published on topics such as cash flow models, investments, public finance and academic program cost models.  At Spring Hill College, where Dr. Johnson was the Associate Vice President for Academic Affairs, his responsibilities included participating in the College's budgeting process.   At the site visit, Drs. Johnson and Fiskeaux both participated in the meetings with Hiwassee's auditor, the chair of the finance committee, and the chairman of the Board of Trustees.   Further, SACS argues, Dr. Johnson drafted a portion of the financial observations in the Special Committee report, and Dr. Johnson and Ms. LePrevost both testified via affidavit that they provided feedback to Dr. Fiskeaux on the other portions of the report, and the report was revised based on that feedback.  *See* Johnson Aff., ¶ 7; LePrevost Aff., ¶ 5.

AO 72A
(Rev.8/82)

There is no dispute that Dr. Fiskeaux had the greatest financial background of the three members of the Special Committee.  SACS' policy simply requires that "additional committee members" accompany the "financial reviewer" to assess the impact of financial instability on the institution.  Nothing about the makeup of the Special Committee here violates that policy, and thus, Hiwassee cannot sustain its claim that SACS failed to follow its own procedures.[9] Further, it is clear that both Drs. Johnson and Fiskeaux have financial experience.  The bottom line of Hiwassee's assertion is that Dr. Fiskeaux was able to use his financial expertise to unduly influence the other two committee members.  There is, however, no evidence in the record to support this speculation.

5.    SACS' Staff Liaison

Plaintiff contends that Dr. Tom Benberg, the staff member of SACS who was assigned as a liaison between the Commission and Hiwassee, failed properly to fulfill his duties. Specifically, Plaintiff contends that Dr. Benberg (1) failed to explain to the Special Committee or the Compliance & Reports Committee the significance of the Comprehensive Standard, (2) did not share information prepared by the SACS staff which portrayed

---

[9]The parties engage in an extended dispute over whether Dr. Johnson considered himself a financial "reader" or reviewer.  A "financial reader" has special meaning within SACS' policies on the Compliance and Reports Committee.  There is no dispute that Dr. Johnson is not a "financial reader," nor is there any dispute that he requested that a person who qualified as a financial reader be placed on the Special Committee considering the circumstances of Hiwassee's review.  But, again, none of this is relevant to any due process violation because there is no policy that would require the Special Committee to have more than one financial reviewer.

Hiwassee's financial situation in a better light than did the Special Committee, (3) did not provide advice to Hiwassee on the key issue of interfund borrowing, and (4) failed to inform the reviewing bodies that there was an option for an additional year of supervision (the Focused Fifth Year Report) in alternative to removing Hiwassee's accreditation. Hiwassee also asserts that in his meetings with Dr. Noseworthy, Dr. Benberg focused only on Hiwassee's need to address its end-of-year negative unrestricted net assets. Hiwassee contends that it successfully handled this issue because in 2004 its end-of-year unrestricted net assets were a positive $66,524, as compared to a negative $337,668 in 2001.

The court notes that Hiwassee essentially takes issue with the manner in which Dr. Benberg did his job. The court's task here, of course, is not to evaluate Dr. Benberg's job performance; rather, it is to determine whether Dr. Benberg's role fell below that which would be required by "due process."

Most significant, the court notes that there is no "Focused Fifth Year Report" provided for in SACS' policies. A "Focused Report" relates to findings of the Off-Site Review Committee. *See Policies of the Commission on Colleges*, Reports Submitted for Committee of Commission Review, The Focused Report, at 2, Bates No. 59. As the court explained above, because the Special Committee did an on-site visit, the Off-Site policies do not apply to this situation. The "Fifth-Year Follow-Up Report"

> submitted five years prior to the institution's next decennial review, addresses issues identified at the completion of the institution's last visiting committee review that required monitoring for verification of continued compliance. An

25

> institution is requested to submit a Fifth-Year Follow-Up Report if it has
> successfully responded to the recommendations of the visiting committee and
> is in compliance with accreditation standards, and the nature of the response or
> the recent history of the institution necessitates monitoring of continued
> compliance.

*Id.* at 3, Bates No. 60.   Clearly, this situation was not applicable to Hiwassee, which had

already been placed on probation and was not considered to be in compliance with the

*Principles* at that time.  *See*, *e.g.*, Cormier Depo., at 59-60.

The court has addressed above the Core Requirement/Comprehensive Standard issue.

Donna Barrett, Associate Executive Director, Finance, Commission on Colleges, did provide

a financial report for the use of the Commission on Colleges' staff.  *See* Plaintiff's Exh. 19.

But that report explicitly stated that it was "not intended to replace or affect the peer review

process."  *Id.*  Hiwassee points to no policy of SACS which would require that such an analysis

be provided to anyone.   Furthermore, while the financial analysis may have been more

favorable to Hiwassee than the Special Committee report, it was not a ringing endorsement

of Hiwassee's financial situation.   *Id.* ("Overall thoughts:   Institution has made dramatic

progress, but no progress has been made on the reduction of endowment borrowing.   Indeed,

borrowing against the endowment has increased.").

Finally, Hiwassee contends that Dr. Benberg did not give the College sufficient advice

with respect to interfund borrowing and improperly steered the College toward focusing on

unrestricted net assets.   Hiwassee essentially complains that Dr. Benberg did not anticipate

what the Special Committee might focus on in its review.  However, as the court set out above,

Hiwassee had been under increased SACS scrutiny from 2000. The series of reports made by the College and visits by SACS personnel to the College focused on financial stability. Hiwassee, itself, admits that interfund borrowing had been a concern of SACS' since the 1990s. It is difficult to see that Dr. Benberg's job performance, whether perfect or something less, violated the due process rights of Hiwassee under these circumstances.

6.   Administrative Record

Plaintiff contends that SACS did not supply the full administrative record to Hiwassee, omitting the minutes of the Compliance & Reports Committee and the Executive Council, as well as written one-line recommendations contained in the reports of the Compliance & Reports Committee and the Executive Council.

SACS responds that the minutes and the one-line recommendations are not part of the administrative record and, therefore, are not materials turned over in an appeal. SACS further argues that the reports of the Committee on Compliance and Reports and the Executive Committee consist only of memorializations of the decisions of those bodies and have no further information. *See* Luthman Aff., ¶ 6. Ms. Luthman further testified that the "Administrative Record does not contain the minutes of the C&R Committee or of the Executive Committee because those minutes do not fall within the definition of 'Administrative Record' contained in SACS' policies." *See id.*, ¶ 21.

SACS' *Policies of the Commission on Colleges* set forth the appellate procedures for the Commission. The *Policies* state that at "least 30 days before the date of the appeals

hearing, the Commission must submit to the institution and the appeals Hearing Officer documents (administrative record) used by the Commission leading to and arriving at the decision regarding the institution." *See id.*, Appeals Procedures of the College Delegate Assembly of the Commission on Colleges, Policy Statement, IV. Appellate Procedures, ¶ E, at 4. The court agrees with Hiwassee that the statements of Ms. Luthman in her affidavits are somewhat circular. In her deposition, however, Ms. Luthman testified that the Compliance and Reports Committee comes to a consensus on a recommendation and generally does not take a vote of its members. *See* Luthman Depo., at 88. The Executive Council considers "the recommendation of the Compliance and Reports Committee, the staff memoranda on the case, and the oral presentation of the C&R chair." *Id.* at 88-89. The Commission on Colleges then reviews the recommendation from the Executive Council. *Id.* at 88.

Based on this testimony, it would not appear to the court that the minutes of the Executive Council or the Compliance and Reports Committee would be "used by the Commission leading to and arriving at the decision regarding the institution." *See* Appeals Procedure. However, it is possible that the one-line recommendations would fall under this definition.

The court need not resolve this issue, however, because Hiwassee concludes its argument by noting that "these documents, ***although lacking any substantive analysis***, should have been included in the Administrative Record." *See* Response, at 34 (emphasis added).

28

Even if the court considers that the minutes and the reports should have been included in the Administrative Record, Hiwassee has failed to demonstrate how its due process rights were violated by their omission.   For example, Hiwassee does not contend that had these materials been turned over, it would have prepared differently for the Appeals Hearing or the outcome of the appeals process would have been different in some demonstrable way.

7. <u>Conflict of Interest</u>

Prior to Hiwassee's hearing before the Appeals Committee on February 23, 2005, Ann McNut, one of the elected members of the Appeals Committee, was unable to participate due to a family emergency.   Under SACS' policy, the Chair of the Commission on Colleges selects an alternative to serve on the Appeals Committee.   The Chair selected Jimmy Goodson to replace Ann McNut.

Hiwassee contends that Mr. Goodson should not have served on the Appeals Committee reviewing Hiwassee's appeal because he had a conflict of interest resulting from his having served on the Compliance and Reports Committees that reviewed Hiwassee in 2000 and 2003.   SACS responds that Mr. Goodson did not have a conflict of interest because he had not voted on the accreditation status of Hiwassee during the Commission meeting or during the Compliance and Reports meeting in which the issue of removing Hiwassee from membership was considered.

29

SACS' Appellate Procedures direct that a

> member of the Appeals Committee shall recuse him/herself from that appeals hearing if there is a conflict of interest or an appearance of a conflict of interest. As defined by the Commission, a conflict of interest, or the appearance of a conflict of interest, as applied to members of the Appeals Committee exists if the Committee member (1) is employed within a state where the parent campus of the institution is located, (2) has voted on the accreditation status of the institution – either during the Commission meeting or the meetings of the Committees on Compliance and Reports – at any time leading to the appealable decision, or (3) has served as a member of the site team which visited the institution and resulted in a committee report at any time leading to an appealable decision.

*See* Appeals Procedures of the College Delegate Assembly of the Commission on Colleges, Policy Statement, II. Selection of the Appeals Committee and the Hearing Officer, ¶ A, at 1.

There seems to be no dispute that Mr. Goodson voted on Hiwassee's accreditation status in 2000 and 2003. The question is whether those votes can be considered as falling under the category of "at any time leading to the appealable decision." The court finds that Hiwassee raises a colorable claim here. Throughout the litigation, SACS has defended its decision to remove Hiwassee from membership in light of the context of SACS' supervision of the school since 2000. SACS has also argued that the reason the only options for Hiwassee in December 2004 were removal from membership or coming into compliance with the *Principles* was that the school had exhausted its remaining "supervision" options. The decisions in 2000 and 2003 were arguably part of that process. Thus, the court finds that Mr. Goodson did have a conflict of interest and should not have served on the appeals panel. As

30

the court discussed in *Auburn*, conflict of interest issues are part of what the court can consider on a "common law due process" challenge.

8.     Appeals Committee Opinion Letter

On January 3, 2005, Dr. Noseworthy sent a letter to SACS advising of the College's intent to appeal the decision of the Commission to remove Hiwassee from its membership. That letter set forth the issues on appeal as follows:  (1) the Commission's failure to follow its own procedures due to (a) lack of peer review, (b) failure of the Special Committee to use financial information current to the time of the visit, devote sufficient time to its visit, and inclusion of factual errors in the report, and (c) "distortion" of the review process by the Committee on Compliance and Reports; and (2) the Commission's action was arbitrary and unreasonable because (a) the Special Committee's focused on interfund borrowing while the 2003 recommendations in this area were only suggestions and not a recommendation, (b) the Special Committee utilized a "single financial ratio" as opposed to a balanced approach to the data, (c) the Compliance and Reports Committee failed to recognize that Hiwassee had available financial resources to support its quality academic programs, and (d) the removal is inconsistent with the Commission's new guidelines on commitment to protecting quality education that serves important missions and is contrary to past decisions of the Commission.

The notification letter of the Appeals Committee to Hiwassee College states:

Following the hearing on February 23, 2005, of your appeal in the matter of Hiwassee College, the Appeals Committee of the Commission on Colleges of the Southern Association of Colleges and Schools has unanimously decided

31

to affirm the Commission's decision of December 6, 2004, to remove Hiwassee College from membership status.     Specifically, the Appeals Committee finds the Commission's decision reflected a reasonable application of the *Principles of Accreditation: Foundations for Quality Enchancement*, which clearly included the application of professional judgment of peer evaluators representing the Commission in the assessment of compliance with the *Principles* Core Requirement 2.11 (Resources).     The decision of the Commission is supported by substantial evidence available to the visitors, reviewers, and the Commission as contained in the administrative record and as attested to in the testimony on Appeal.

It is not the function of the Appeals Committee to substitute its judgment for the judgment of those who evaluated the College's compliance with the *Principles*.    Rather, to reverse the Commission, it is necessary that the Committee find that the decision to remove the College from membership was arbitrary and unreasonable and not based on the *Principles*.     The Appeals Committee finds that the decision regarding the College's ongoing membership was neither arbitrary, nor unreasonable.

The Committee further finds that Hiwassee College has not shown that the Commission, in reaching its decision, failed to follow its procedures.

The decision of the Appeals Committee was reached after full consideration of the substantial record and testimony of witnesses offered by the College and the Commission at the hearing on February 23, 2005.

*See* Letter from Edward D. Jackson, Jr. to Dr. James A. Noseworthy, dated February 24, 2005.

Hiwassee argues that the letter the Appeals Committee provided to Hiwassee did not conform to SACS' policy; is not one a court could review for statements of the case, facts, arguments and conclusions; does not meet the Department of Education requirements; and did not meet the level of detail provided to Mt. Olive College, an institution involved in a separate appeal.  SACS responds that the letter of the Appeals Committee complied with SACS' policy.

32

As an initial matter, the court notes that whether the Appeals Committee letter meets the requirements of the Department of Education is not a matter of due process.   Any requirements of the Department of Education promulgated in the form of regulations under the Higher Education Act are not *per se* relevant to Hiwassee's due process claim.   The court addresses below Hiwassee's claim that it has a private right of action under the Higher Education Act.   Finally, the fact that the Appeals Committee provided a more detailed letter to another institution is no indication of a lack of due process, particularly where Mt. Olive's appeal was in part successful, and thus, the notification letter required greater detail.

The court, however, does consider Hiwassee's argument that the letter did not comply with SACS' policies.  Under SACS' Appellate Procedures,

> within seven days of the date of the appeals hearing, the Chair of the Appeals Committee shall inform the President of the Commission on Colleges and the institution's chief executive officer and chair of the board in writing of the decision.   This notification must include specific reasons for the decision, must address each grounds for appeal identified by the institution, and must address the Commission's findings with regard to standard on which the Commission's decision was based.

*See* Appeals Procedures of the College Delegate Assembly of the Commission on Colleges, Policy Statement, IV. Appellate Procedures, ¶ K, at 5.

The court finds that the letter includes the Commission's standard for the decision and specific reasons for the decision (i.e., professional judgment of peer evaluators that Hiwassee was not in compliance with Section 2.11).   The letter also addresses Hiwassee's procedural and substantive arguments.   The court certainly agrees that it would have been possible to write

33

a more detailed letter concerning the appeals procedure, but this letter does not violate SACS' appellate procedures.

        9.    <u>Rubber-Stamping</u>

Hiwassee asserts that its due process rights have been violated because the Executive Council and the Commission on Colleges merely rubber stamp what the Special Committee has recommended. Hiwassee contends that at its December 6, 2004 meeting, the Commission on Colleges considered 86 institutions within an hour and twenty minute period. The Executive Council's time to make recommendations to the Commission on Colleges for those 86 institutions took one and one-half hours. Hiwassee also complains that neither the Executive Council nor the Commission on Colleges receives the full record; rather, they rely upon the recommendations of the Compliance and Reports Committee

Hiwassee's own exhibits belie the argument that all of the decisions of the Special Committee are "rubber-stamped." For example, during the December 3-4, 2004 meeting of the Committee on Compliance and Reports, several actions were recommended to the Executive Council for approval. This included placing a separate institution, Edward Waters College, on probation. *See* Plaintiff's Exh. 13. In the Report from the Executive Council to the Commission on Colleges, however, Edward Waters College was slated for removal from membership. *See* Plaintiff's Exh. 14. This indicates that the Executive Council was not simply rubber stamping the decision of the body below it in the chain of decision-making.

There is nothing unusual in a tiered review system in limiting the amount of information available for review at higher levels.  Hiwassee has pointed to no due process requirement that all levels of review receive the full record of decision-making.  It would be an inefficient process if all bodies started from the ground up in their review of the Special Committee's recommendation.  Furthermore, as discussed below, Hiwassee had an opportunity to make further argument and present the testimony of witnesses during the Appeals Hearing.  The court cannot conclude based on this record that the manner of SACS' review violates due process.

    10.    Cross-Examination of Witnesses

Under SACS' appeal procedures, no cross-examination of witnesses may occur at the Appeals Committee hearing.  Hiwassee contends that this procedure harmed it because Dr. Fiskeaux's testimony at the appeals hearing included hearsay evidence and incorrect factual information.  Hiwassee asserts that Dr. Fiskeaux testified that the college's auditor, Larry Neal, told him that "the college would absolutely hit the wall in three years."  Mr. Neal, however, cannot recall making that statement.  Hiwassee also contends that Dr. Fiskeaux incorrectly testified that if Hiwassee used a $1.79 million grant in 2007 to reduce interfund borrowing pursuant to a plan submitted by Hiwassee to the Appeals Committee, that would reduce the College's total net assets.  Such a change, however, would not *reduce* Hiwassee's assets, but rather just shift them to different places.

35

At the appeals hearing, Hiwassee's counsel made an opening statement and then presented the testimony of Dr. Noseworthy, President of Hiwassee College; Randy Nelson, Vice President for Advancement of Hiwassee; Kirk Treible, Vice President of Business and Treasurer of Hiwassee; Bishop James Swanson, current presiding bishop of the United Methodist Church conference; Dr. Al Bowles, Chattanooga District Superintendent of the United Methodist Church and Chairman of the Board of Hiwassee College; and Karl Jordan, Hiwassee's financial accountant and member of Hiwassee's Board of Directors.

Each of these witnesses testified about the plans Hiwassee had to secure its financial stability, touching upon interfund borrowing and the College's plans to sell certain tracts of land to raise money. Each also testified about the unique nature of two-year residential colleges serving poor and rural student populations. Notable for the purpose of Hiwassee's complaint about cross-examination, Mr. Treible testified that in his long experience as college administrator, he believed that "under the worst circumstances," Hiwassee "could continue for a decade." *See* Appeals Hearing Transcript, at 59. The appeals panel was then permitted to ask questions of Hiwassee's witnesses.

SACS made its opening statement and presented the testimony of Phillip Stone, the member of the Compliance and Reports Committee charged with presenting the case of Hiwassee College; Dr. Fiskeaux and Ms. LePrevost of the Special Committee; George Zubrod, another member of the Compliance and Reports Committee who focused on the financial viability of Hiwassee; and Patty Cormier, from the Compliance and Reports

36

Committee.   Again, the members of the Appeals Panel were permitted to, and did, question these witnesses.

At the conclusion of the hearing, both Hiwassee and SACS' counsel were permitted to make closing statements.   Hiwassee's counsel specifically addressed the $1.79 million grant in his closing statements. *See* Appeals Hearing Transcript, at 165-66.

While cross-examination of witnesses may be a hallmark of due process at the trial stage, Hiwassee has provided no citation for its contention that cross-examination of witnesses during an appellate proceeding is required under due process standards. Furthermore, there is no basis for Hiwassee's contention that two pieces of testimony from Dr. Fiskeaux violated its due process.   Dr. Fiskeaux's testimony did not go unchallenged. Hiwassee was able to present its own testimony which directly contradicted Dr. Fiskeaux's testimony concerning the viability of the institution.   Furthermore, Hiwassee's counsel was permitted time for a closing argument to address any misrepresentations he believed occurred earlier in the proceeding.   For these reasons, the court does not find that Hiwassee's due process rights were violated because it was not permitted to cross-examine Dr. Fiskeaux during the Appeals Hearing.

### C.      Private Right of Action under HEA

In *Auburn*, this court considered the institution's claim of an implied private right of action under the Higher Education Act.   There, Auburn argued that the statute's grant of federal jurisdiction would support an implied right of action.   *See* 20 U.S.C. § 1099b(f) (any civil

37

action brought by institution of higher education involving denial, withdrawal, or termination of accreditation "shall be brought in the appropriate United States district court").   Although the court stated, "this section is susceptible of an interpretation that the HEA would allow such a suit," it did not need to reach a decision because Auburn was not challenging the "denial, withdrawal, or termination of accreditation."   *See* 2002 U.S. Dist. LEXIS 26478, at *48.

        Since this court issued its order in *Auburn*, the Eleventh Circuit has held that there is no private right of action under any provision of the HEA.   The court remarked that "nearly every court to consider the issue in the last twenty-five years has determined that there is no express or implied private right of action to enforce any of the HEA's provisions."   *See McCulloch v. PNC Bank Inc.*, 298 F.3d 1217, 1221 (11th Cir. 2002) (collecting cases and considering suit by parents of college-bound high school students against marketers of student loans for failure to inform them of availability of certain loan programs).   *See also Thomas M. Cooley Law School v. ABA*, 459 F.3d 705, 711 (6th Cir. 2006) (specifically rejecting plaintiff's claims that § 1099b(f) inferred private right of action in accreditation case); *College Loan Corp. v. SLM Corp.*, 396 F.3d 588, 598 (4th Cir. 2005); *Slovinec v. DePaul University*, 332 F.3d 1068, 1069 (7th Cir. 2003); *Parks School of Business, Inc. v. Syminton*, 51 F.3d 1480, 1484 (9th Cir. 1995); *Labickas v. Arkansas State University*, 78 F.3d 333, 334 (8th Cir. 1996); *L'ggrke v. Benkula*, 996 F.2d 1346, 1348 (10th Cir. 1992).   For these reasons, the court finds that Hiwassee cannot bring a claim under the Higher Education Act.

AO 72A
(Rev.8/82)

**III.     Conclusion**

The court GRANTS IN PART AND DENIES IN PART Defendant's motion for summary judgment [84-1]; DENIES AS MOOT Plaintiff's motion for partial summary judgment on Count IV of Plaintiff's Second Amended Complaint [94-1]; GRANTS IN PART AND DENIES IN PART Plaintiff's supplemental motion for summary judgment on Counts I and IV of the Second Amended Complaint [112-1]; DENIES AS MOOT Plaintiff's motion to strike Exhibit 1 of Defendant's reply brief [129-1]; and DENIES AS MOOT Defendant's motion to strike affidavit [132-1].

**IT IS SO ORDERED** this 2nd day of February 2007.

_____s/ J. Owen Forrester_____
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE

39

AO 72A
(Rev.8/82)